# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | |
|---|---|
| MICHAEL JASON MORGAN, ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | No.: 1:18-CV-256 |
| ) | |
| KATHY STANSBERRY, ) | Judge Collier |
| BENNIE RICHARDSON, ) | |
| NATHAN TRENTHAM, ) | |
| JOE GUY, and ) | |
| MCMINN COUNTY, TENNESSEE, ) | |
| ) | |
| *Defendants*. ) | |

## M E M O R A N D U M

Defendants Nurse Kay Stansberry,[1] Nurse Bennie Richardson, Sheriff Joe Guy, and McMinn County, Tennessee (together, "Defendants") have filed a motion for summary judgment in this pro se prisoner's civil rights action for violation of 42 U.S.C. § 1983 [Doc. 40]. Upon consideration of the parties' pleadings, the summary judgment evidence, and the applicable law, the Court finds that summary judgment should be **GRANTED** in favor of Defendants, and this action should be **DISMISSED**.[2]

**I.      BACKGROUND**

   **A.      Plaintiff's Allegations**

Plaintiff alleges that while he was an inmate confined in the McMinn County Jail ("Jail"), Defendants improperly distributed his seizure medicine, refused to take him to the hospital or have

---

[1] Plaintiff incorrectly identified this Defendant as "Kathy Stansberry" [*See* Doc. 41 n. 1].

[2] Defendant Trentham has not appeared in this action [*See* Doc. 16]. However, for the reasons set forth *infra*, the Court determines that Plaintiff cannot sustain the claims against Defendant Trentham, and that he is likewise entitled to be dismissed from this action.

him seen by a physician, failed to ensure medical staff were available on the weekend, placed him on the top floor of the jail, failed to fix his broken dentures or provide him with denture cream, placed him on lockdown for a week, permitted him to get into an altercation with another inmate, and verbally bullied him [Doc. 30].

B.   **Factual History**

Plaintiff was confined in the Jail from April 3, 2018, until October 23, 2018 [Doc. 40-1 p. 12–13; Doc. 40-2 p. 1].   However, Plaintiff has a history with the Jail that, while itself not legally relevant to this action, sheds light on facts that are relevant in this case.   On November 22, 2016, Plaintiff was arrested by the Etowah Police Department in McMinn County, Tennessee, on various charges, including burglary, theft, trespass, and vandalism [Doc. 40-2 p. 29–31; Doc. 40-3]. During the booking process, a medical questionnaire was completed in which it was noted that Plaintiff had a history of epilepsy and was on the medications Keppra and Lamictal for seizures [Doc. 40-2 p. 32; *see also* Doc. 40-4 p. 13].   Plaintiff has been taking these medications since approximately 2007 and has had seizures since he was a child [Doc. 40-1 p. 2–3, 8–9].   Plaintiff's seizures occurred before and during his incarceration [*Id.* at 8–9].

A physical examination of Plaintiff was also completed during the booking process, in which the questionnaire findings were confirmed [Doc. 40-4 p. 11].   It was determined that Plaintiff uses a nerve stimulator wand magnet, has had previous head injuries from moving vehicle accidents, and has dentures [*Id.*].   The following day, on November 23, 2016, the Jail posted a notice to officers that Plaintiff had a "black square disc with him" that officers should "not take away from him" because it was a nerve stimulator wand/magnet used for seizures [Doc. 40-4 p. 9; Doc. 40-5].   It appears that Plaintiff was incarcerated at the Jail from November 22, 2016 until January 2017 [*See* Doc. 40-2 p. 29; Doc. 40-6 p. 22].

2

Plaintiff was subsequently arrested on February 28, 2017, for indecent exposure at North Etowah Baptist Church [Doc. 40-2 p. 40–41, 46; Doc. 40-9]. Later that same year, on August 1, 2017, Plaintiff was arrested for violation of probation due to a failed drug test [Doc. 40-2 p. 17–18; Doc. 40-10]. Plaintiff was found to be in violation of his probation on October 9, 2017, and on that date, he was reinstated to a mental health court on time served [Doc. 40-2 p. 15]. Thereafter, Plaintiff was arrested for a subsequent probation violation on April 3, 2018 [*Id*. p. 1–2]. After a few months in Jail and while still incarcerated, Plaintiff was again found in violation of his probation on October 12, 2018 [Doc. 40-2 p. 9; Doc. 40-11].

Plaintiff's stay at the Jail from April 3, 2018, until late October 26, 2018, was littered with general and medical grievances[3] [*See* Doc. 40-1 p. 4; Doc. 40-6; Doc. 40-8]. The legally significant grievances made during this time period can be summarized as: roughly six requests for denture cream; grievances on July 30, 2018, August 20, 2018, and September 24, 2018, stating that he was only getting his medications twice a day on the weekends instead of three times a day; several inquires and requests related to going to the hospital and/or seeing the doctor; and a few grievances regarding Correction Officer Boo Hampton ("CO Hampton"), in which Plaintiff alleged that CO Hampton verbally bullied him [Doc. 40-6; Doc. 40-8].

## II.     STANDARD OF REVIEW

Summary judgment is proper only when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a),(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A fact is deemed "material" if resolving that fact in favor

---

[3] As the Court explains in Part IV.A., only the events that allegedly occurred at the Jail during Plaintiff's 2018 stay are relevant to the instant suit.

of one party "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of his case for which he bears the ultimate burden of proof at trial. *Celotex*, 477 U.S. at 322; *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993).

Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is not appropriate by setting forth specific facts showing there is a genuine issue for trial. *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249. If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact. *Anderson*, 477 U.S. at 248. If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 889 (1990)).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Fed. R. Civ. P. 56, Advisory Committee Note to the 1963 Amendments. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party (the plaintiff in this case), must come forward with proof to support each element of his claim. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan*, 497 U.S. at 888, or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252. It would undermine the purposes of summary

4

judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan*, 497 U.S. at 888. Therefore, in considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible*. *Matsushita,* 475 U.S. at 586. (emphasis added). "[D]etermining whether a complaint states a plausible claim for relief. . . [is] context-specific[,] . . . requir[ing] the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (discussing plausibility of claim as a requirement to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).

In considering a motion for summary judgment, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, . . . [the ultimate decision becomes]. . . a pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

A district court cannot grant summary judgment in favor of a movant simply because the adverse party has not responded, however. *Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 614 (6th Cir. 1998). Rather, the court is required to, at a minimum, examine the motion to ensure that the movant has met its initial burden. *Id*. In doing so, the court "must not overlook the possibility of evidentiary misstatements presented by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 407 (6th Cir. 1992). The court must "intelligently and carefully review the legitimacy of [] an unresponded-to motion, even as it refrains from actively pursuing advocacy or inventing the *riposte* for a silent party." *Id.* In the absence of a response, however, the Court

will not "*sua sponte* comb the record from the partisan perspective of an advocate for the non-moving party." *Id*. at 410. If the court determines that the unrebutted evidence set forth by the moving party supports a conclusion that there is no genuine issue of material fact, the court will determine that the moving party has carried its burden, and "judgment shall be rendered forthwith." *Id*. (alteration omitted).

### III. SUMMARY JUDGMENT EVIDENCE

#### A. Alleged Improper Distribution of Medicine

Plaintiff testified that he sometimes did not receive his medications on the weekends [Doc. 40-1 p. 5]. However, Plaintiff did not remember any specific days in which he did not get his medications [*Id*. at 50-6]. Additionally, Plaintiff testified to the fact that sometimes he would not get up to receive his medications [Doc. 40-1 p. 5; Doc. 40-13 p. 19; Doc. 14-14 p. 10–11, 14]. Furthermore, Plaintiff admitted in his deposition that the records show he received most of his medications [Doc. 40-1 p. 7]. Corrections Officer ("CO") Buckna specifically remembered giving Plaintiff his medications and having him sign a form acknowledging same [Doc. 40-15 p. 2–3; *see also* Doc. 40-12 p. 2, 8–9]. CO Buckna also confirmed that almost all entries on the Medical Administrative Records ("MARs") are signed, and, if signed, indicate that Plaintiff received his medications [Doc. 40-15 p. 6; Doc. 40-16; Doc. 40-17; Doc. 40-14 p. 3; Doc. 40-12 p. 9].

Nurse Stansberry testified that the MARs note the medications were packaged and placed on the "med cart" for Plaintiff, and that this occurred almost one hundred percent of the time [Doc. 40-13 p. 13–14; *see also* Doc. 40-14 p. 5, 15]. She further testified that any blanks or discrepancies on Plaintiff's MARs may have been because officers did not have time for Plaintiff to sign for his medications, that Plaintiff may have refused his medications, or that Plaintiff may

6

not have gotten up to receive his medications [Doc. 40-13 p. 3, 18–19; *see also* Doc. 40-1 p. 5; Doc. 40-14 p. 14].

Nurses Stansberry and Richardson noted that Plaintiff signed for and therefore acknowledged that he received almost all of his doses of medicine as to the July 30, 2018, grievance [Doc. 40-13 p. 16; Doc. 40-14 p. 13; *see also* Docs. 40-16 p. 20–21 and 40-17 p. 11]. Furthermore, as to the September 24, 2018, grievance, Stansberry noted that Plaintiff received all of his nighttime doses of medicine in September 2018 [Doc. 40-13 p. 15; *see also* Doc. 40-17 p. 13]. Moreover, both nurses testified that Plaintiff missing occasional doses of his medications would not be enough to trigger a seizure in and of itself, and would not pose a substantial risk of harm to Plaintiff [Doc. 40-13 p. 17, 20; Doc. 40-14 p. 6]. Nurse Stansberry also explained that people on seizure medications, such as Plaintiff, can have break-through seizures, and that medication is merely used to prevent seizures as much as possible [Doc. 40-13 p. 17]. Moreover, she stated that there is no difference in Plaintiff having seizures inside or outside of the jail, where Plaintiff has admitted they have occurred throughout his life despite medication and a vagal nerve stimulator [*Id.*; Doc. 40-1 p. 8–9].

### B. Availability of Medical Staff

Nurses are on site at the Jail Monday through Friday from roughly 8:00 am. to 10:00 p.m. [Doc. 40-13 p. 11]. Furthermore, one of the nurses is on call every day, twenty-four hours a day [*Id.* at 10; Doc. 40-14 p. 9]. Moreover, nurses can access the physician, Dr. Nathan Trentham, twenty-four hours a day, seven days a week, in addition to Dr. Trentham being on site on Fridays [Doc. 40-13 p. 9; Doc. 40-15 p. 5; Doc. 40-18 p. 4]. Whenever an inmate has a medical grievance, the physician is consulted, and a method of treatment is determined by the doctor and the nurses [Doc. 40-13 p. 21–22, 31; Doc. 40-19; Doc. 40-14 p. 8].

### C. Hospital and/or Physician Visits

Plaintiff alleges that he was never seen by the Jail doctor or taken to the hospital [*See* Doc. 30]. However, when he received a laceration on September 9, 2018, after becoming dizzy and falling, Plaintiff was evaluated, Nurse Stansberry consulted with Dr. Trentham, and Plaintiff's laceration was glued back together [Doc. 40-13 p. 4, 21–22; Doc. 40-15 p. 15; Doc. 40-14 p. 7]. This is a standard course of action for the injury, regardless of whether the person being treated is in the hospital or in Jail [Doc. 40-13 p. 22]. Stemming from the same incident, Dr. Trentham determined Plaintiff did not need to go to the Emergency Room or have an MRI performed, and thus, neither were ordered [Doc. 40-13 p. 22–23; Doc. 40-14 p. 16].

Again, on September 11, 2018, and stemming from the same incident, Plaintiff complained of his back hurting in a medical grievance, and the Jail responded, "clinic" [Doc. 40-8 p. 5]. Nurse Stansberry stated that in that instance, "clinic" meant that Plaintiff was called to the clinic, evaluated, and administered medication for his back [Doc. 40-13 p. 7, 24]. Approximately three days later, Plaintiff submitted another medical grievance and asked why he did not see the doctor or go to the clinic [Doc. 40-8 p. 4]. Nurse Stansberry provided that the response that was given to that grievance — that is, "not indicated" — meant that the need to see Dr. Trentham face-to-face was not indicated based on the nurses' evaluation and the doctor's instructions [Doc. 40-13 p. 6, 24–25; Doc. 40-8 p. 4].

### D. Cell Assignment Claims

Plaintiff complains about his cell and bunk placement in the medical pod at the Jail [*See* Doc. 30]. CO Buckna testified that there are four bunks over two floors in the medical pod at the Jail [Doc. 40-15 p. 8]. Inmates placed in these cells are triaged; inmates considered to be worse off are assigned to bunks located on the bottom floor of the medical pod [*Id.* at 8–9]. Officers

assign bunks to inmates based on availability during booking [*Id*. at 10–11]. At the time of Plaintiff's arrival, there were inmates that were considered to be worse off, including one in a wheelchair, and thus, Plaintiff was assigned a bunk on the "top tier" of the medical pod [*Id*. at 9–11].

According to Nurse Stansberry, inmates with seizures are routinely assigned to bunks throughout the Jail, including on the "top tier and on [the] bottom tier" of the medical pod [Doc. 40-13 p. 2]. An inmate is not stuck with his placement, however, and can request to be moved to another bunk in the medical pod if space becomes available [Doc. 40-15 p. 12]. That said, Nurse Stansberry testified that tier placement is irrelevant to the prevention of seizures [Doc. 40-13 p. 8]. Even so, Plaintiff was ultimately moved to the "bottom tier" of the medical pod on September 27, 2018, at his request [Doc. 40-8 p. 2].

Furthermore, when an inmate has seizures, it is encouraged and preferred for the inmate to sleep on the floor and not in the bunk [Doc. 40-15 p. 9–10]. There is nothing that would have prevented Plaintiff from moving his mat to the floor as the other inmates with seizures did [*Id*. at 10; Doc. 40-1 p. 11]. However, Plaintiff did not always do so [Doc. 40-1 p. 11].

**E.   Dental Claims**

As related to Plaintiff's requests for denture cream, the Jail does not prescribe Fixodent as a medication that is to be provided by medical staff [Doc. 40-13 p. 29–30; Doc. 40-14 p. 18; Doc. 40-8 p. 11–15, 17]. Furthermore, while nurses may advise the Jail doctor about an inmate's painful gums, the facility doctor is not a dentist [Doc. 40-13 p. 30]. As related to denture cream, or Fixodent, the inmates can receive the cream through the commissary [*Id*. at 26; Doc. 40-14 p. 18]. If an inmate wants a specific and different brand of denture cream, the inmate can have someone purchase it at the Madison Avenue Pharmacy and an officer from the Jail will pick it up

[Doc. 40-14 p. 17; Doc. 40-13 p. 26]. This process and the various options for denture cream were explained to Plaintiff several times, and Plaintiff failed to follow the Jail's procedure on numerous occasions [Doc. 40-13 p. 27–29; Doc. 40-12 p. 12–13].

### F. Bullying Claims

Plaintiff filed several grievances concerning verbal disagreements between himself and CO Hampton [Doc. 40-6 p. 5, 10–11, 15].

## IV. DISCUSSION

### A. Statute of Limitations

Plaintiff complains that the Jail violated his constitutional rights beginning in 2016, when he first was housed at the Jail [*See* Doc. 30 p. 3]. However, federal district courts apply the state's statute of limitations for personal injury actions in proceedings arising under 42 U.S.C. § 1983. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Tennessee, the limitations period is one year. *See* Tenn. Code Ann. § 28-3-104; *Moore v. Tennessee*, 267 F. App'x 450, 455 (6th Cir. 2008); *Foster v. State*, 150 S.W.3d 166, 168 (Tenn. Ct. App. 2004) (applying the one-year statute of limitations from Tenn. Code Ann. § 28-3-104 in a § 1983 claim). When the statute of limitations begins to run, however, is an issue of federal law. *Eidson v. State of Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007) (citations omitted). Under federal law, a cause of action accrues, and the limitations period begins to run, when the injury forming the basis of the claim is discoverable. *See Friedman v. Estate of Presser*, 929 F.2d 1151, 1159 (6th Cir. 1991) (citing *Sevier v. Turner*, 742 F.2d 262, 273 (6th Cir. 1984)).

Plaintiff filed the instant suit on October 29, 2018 [*See* Doc. 2]. All of the allegations raised by Plaintiff in his compliant were known to him at the time they occurred. Accordingly, the applicable statute of limitations bars any claims by Plaintiff arising prior to October 29, 2017.

This includes: (1) some of his improper distribution of medicine claims [*See* Doc. 40-8 p. 18–19]; (2) any claim that his rights were violated when he was placed on the top tier of the medical pod [*See* Doc. 40-6 p. 14; Doc. 40-8 p. 18–19]; any claim that the Jail did not repair his teeth [Doc. 40-6 p. 21–22; Doc. 40-8 p. 19]; (4) any claim that he was subjected to cruel and unusual punishment for being placed on lockdown in December 2016 [Doc. 40-20]; and (5) his claim that his rights were violated when he got into an altercation in August 2017 with an inmate that the Jail placed in the medical pod [Doc. 40-21]. All of these claims are barred by the applicable statute of limitations period.

B. **Exhaustion**

Defendants claim an entitlement to summary judgment based on Plaintiff's failure to exhaust his administrative remedies in compliance with the Prison Litigation Reform Act ("PLRA"), which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This mandatory exhaustion requirement is one of "proper exhaustion," which requires a plaintiff to complete "the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006).

However, the PLRA's exhaustion requirement has no application to a lawsuit filed by a former prisoner who is not incarcerated at the time the lawsuit was filed. *See, e.g., Mabry v. Freeman*, 489 F. Supp. 2d 782, 785 (E.D. Mich. 2007) (collecting cases). Plaintiff was released from Jail on October 23, 2018 [Doc. 40-1 p. 12–13]. He filed his initial complaint on October 29, 2018 [Doc. 2]. Therefore, Plaintiff was a former inmate at the time he filed the instant suit, and

11

the PLRA's exhaustion requirement does not apply.

**C.     Entity Liability**

In his amended complaint, Plaintiff fails to identify whether he is suing Defendants in their individual capacities, official capacities, or both. Under Sixth Circuit precedent, this Court assumes, then, that each Defendant is being sued in his or her official capacity. *See, e.g., Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir. 1991) (finding in absence of indication that defendants are sued individually, courts assume they are sued in their official capacities).

A suit against a defendant in his or her official capacity is treated as an action against the governmental entity the officer represents. *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (holding "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity"); *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Barber v. City of Salem*, 953 F.2d 232, 237 (6th Cir. 1992). Defendants Stansberry, Richardson, and Guy were employees of McMinn County, Tennessee at all times relevant to the current action. Therefore, Plaintiff's claims against these individual Defendants are treated as claims against McMinn County, Tennessee. *See Graham*, 473 U.S. at 166; *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978) ("[O]fficial-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent.").

McMinn County cannot be held liable under § 1983 for any "injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. Rather, it is only when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id*. As such, "[a] plaintiff raising a municipal liability claim under § 1983 must demonstrate that the alleged violation occurred because of a municipal policy or

custom." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

A plaintiff asserting a § 1983 claim for municipal liability based on the existence of a custom or policy must identify the policy, connect it to the municipality, and demonstrate that the injury was incurred because of the execution of that policy. *Graham ex rel. Estate of Graham v. Cty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004). "There must be a 'direct causal link' between the policy and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violations." *Id.* (citations omitted).

Here, Plaintiff fails to allege that the execution of any particular policy or custom of McMinn County violated any of his rights. In fact, the Jail has a specific nine-step process to ensure the proper distribution of medications [*See* Doc. 40-22 p. 4]. As the Court has already noted, Defendants' records show that Plaintiff received his medications a vast majority of the time [Doc. 40-1 p. 7; Doc. 40-15 p. 2–3, 6; Doc. 40-13 p. 13–14; Doc. 40-14 p. 2–3, 4–5, 15; Doc. 40-12 p. 9; Doc. 40-16; Doc. 40-17]. Furthermore, there is no evidence showing that any allegations of the missed doses are the fault of Defendants, as it could be due to Plaintiff's failure to sign for his medications or get up to receive them [Doc. 40-13 p. 3, 18–19; Doc. 40-1 p. 5; Doc. 40-14 p. 14]. Moreover, Jail employees consistently responded to Plaintiff's grievances [Doc. 40-6; Doc. 40-8; Doc. 40-23]. Lastly, even if Plaintiff missed a few doses of his medication, this cannot be attributed as an avoidable cause of any subsequent seizure, as Plaintiff admitted under oath that he had seizures all of his life outside of the Jail, even when he takes his medications and uses his vagal nerve stimulator magnet [Doc. 40-13 p. 17; Doc. 40-14 p. 6].

Additionally, as to not being transported to the hospital or being seen by the physician, there is no evidence in the record that should have placed McMinn County on notice that Plaintiff was not receiving constitutionally adequate medical care as directed by Defendant Trentham.

Accordingly, Plaintiff cannot demonstrate that McMinn County had knowledge of prior unconstitutional violations by Jail employees, as is required for a finding of liability. *See Graham*, 358 F.3d at 383.

To the extent Plaintiff alleges a failure to train, the Court finds any such claim against McMinn County must also fail, because inadequate training serves as a basis for § 1983 liability only "where the failure to train amounts to deliberate indifference to the rights of person with whom the police come into contact." *Canton v. City of Harris*, 489 U.S. 378, 388 (1989). "To establish deliberate indifference, the plaintiff must show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury." *Slusher v. Carson*, 540 F.3d 449, 457 (6th Cir. 2008) (internal quotation marks and citations omitted).

Plaintiff has not pointed to any policy or custom of the Jail that indicates the nurses were inadequately trained as to inmate medical care. The written policy of the Jail belies any claim of deliberate indifference or municipal liability [Doc. 40-22]. Further, all correctional officers at the Jail are certified law enforcement officers by the Tennessee Corrections Institute [Doc. 40-15 p. 7; Doc. 40-18 p. 2].

There was no deliberate conduct on the part of McMinn County, Tennessee that served as the direct, causal link of any alleged constitutional violation. *See Graham*, 358 F.3d at 383. Accordingly, Defendants are entitled to summary judgment as to the claims against them in their official capacities.

### D. Individual Liability

Although the Court has determined that Plaintiff has not sued Defendants in their individual capacities, the Court will, out of an abundance of caution, address any individual capacity claims

that might be inferred from Plaintiff's complaint. In doing so, the Court notes that Defendants have raised the defense of qualified immunity regarding any individual-capacity claims [Doc. 41 p. 19–25].

Qualified immunity protects governmental employees from individual, civil liability, as long as their conduct does not violate clearly established "constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An evaluation of qualified immunity requires the Court to conduct a three-pronged inquiry: (1) whether there was a constitutional violation; (2) whether the violated right was "clearly-established;" and (3) whether the official's actions were objectively unreasonable. *Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999).

For a right to be clearly-established, "at the time of the officer's conduct, the law [must have been] sufficiently clear such that 'every reasonable official would understand what he is doing is unlawful.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Once qualified immunity has been pleaded by a defendant, the plaintiff bears the burden of rebutting the defense by showing both "that the challenged conduct violated a constitutional or statutory right, and that the right was so clearly established at the time of the conduct 'that every reasonable official would have understood that what he [was] doing violate[d] that right.'" *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (citing *al-Kidd*, 563 U.S. at 741). In short, it is a defense that protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### 1. Medical Needs

The Court first considers whether any individual Defendant violated Plaintiff's constitutional rights with regard to his medical needs. It is well settled that the Constitution does

not guarantee a prisoner "unqualified access to healthcare." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). However, the denial of constitutionally adequate medical care violates the Eighth Amendment's prohibition against cruel and unusual punishment, which proscribes acts or omissions that produce an "unnecessary and wanton infliction of pain." *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). An Eighth Amendment claim for the denial of adequate medical treatment is composed of two parts: (1) an objective component, which requires a plaintiff to show a "sufficiently serious" medical need; and (2) a subjective component, which requires the plaintiff to show the defendants acted with "deliberate indifference" to that need. *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Negligence is insufficient to establish liability; deliberate indifference requires a mental state amounting to criminal recklessness. *Santiago*, 734 F.3d at 591 (citing *Farmer*, 511 U.S. at 834, 839–40). Therefore, to establish an officer's liability, a prisoner must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Where medical treatment has been provided, a prisoner's disagreement with the adequacy of care given does not implicate the Constitution. *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). This is because "federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* Rather, to state a constitutional claim, such a prisoner must show that his treatment was "so woefully inadequate as to amount to no treatment at all." *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011); *see also Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002). Because of this deference to medical judgments made by trained health care personnel, it is not

16

"unconstitutional for municipalities and their employees to rely on medical judgments made by medical professionals responsible for prisoner care." *Graham*, 358 F.3d at 384 (internal quotation marks and citation omitted).

The Sixth Circuit has recognized that the existence of a sufficiently serious medical need may not be "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899–900 (6th Cir. 2004). In such situations, the Sixth Circuit requires the plaintiff to produce "verifying medical evidence" of "minor maladies or non-obvious complaints of a serious need for medical care." *Burgess*, 735 F.3d at 477 (quoting *Blackmore,* 390 F.3d at 898).

Here, Plaintiff's pleadings, testimony, and record submissions establish that no constitutional violation occurred in this case. First, Plaintiff has not submitted medical evidence in support of his claim against Defendants, and therefore, he has not met his burden to set forth facts establishing a constitutionally recognizable denial of medical care claim. Additionally, Nurses Stanberry and Richardson knew, based on their training and experience, that missing an occasional dose of seizure medication or not sending Plaintiff to the Emergency Room for a personal evaluation by a physician, would not place Plaintiff at a substantial risk of harm [Doc. 40-13 p. 20, 21–24; Doc. 40-14 p. 6].

Additionally, Plaintiff was seen for every medical request he made [*See, generally*, Doc. 40-13; *see also* Doc. 40-8]. Plaintiff was consistently evaluated and provided medication by the medical staff at the Jail [Doc. 40-13 p. 4–6, 7, 21–22, 23, 24–25; Doc. 40-16; Doc. 40-17; Doc. 40-19]. The non-medical staff were entitled to rely on those medical judgments. *See Graham*, 358 F.3d at 384. Moreover, despite Plaintiff's desire for additional treatment, or the fact that he may have missed an occasional dose of medication, the care he received by medical personnel

17

cannot fairly be seen as "so woefully inadequate as to amount to no treatment at all." *See Alspaugh*, 643 F.3d at 169. Accordingly, no Defendant was deliberately indifferent to any serious medical need of Plaintiff, and Defendants are entitled to summary judgment as to Plaintiff's medical needs claims.

### 2. Verbal Harassment

Plaintiff failed to name CO Hampton, the corrections officer who allegedly verbally harassed him, as a party in this lawsuit, and there are no allegations that any named Defendant harassed Plaintiff. Regardless, allegations of verbal harassment or threats by prison officials toward an inmate do not constitute punishment within the meaning of the Eighth Amendment. *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987). Therefore, Plaintiff's allegations of verbal harassment fail to state a constitutional claim.

## V. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [Doc. 40] will be **GRANTED**, and this action will be **DISMISSED WITH PREJUDICE**. The Court hereby **CERTIFIES** that any appeal from this order would not be taken in good faith. Thus, should Plaintiff file a notice of appeal, this Court will **DENY** Plaintiff leave to appeal *in forma pauperis*. *See* 28 U.S.C. § 1915(a)(3); Fed. R. App. P. 24.

**An appropriate order will enter**.

/s/
**CURTIS L. COLLIER
UNITED STATES DISTRICT JUDGE**